## COON v. SMITH.
### No. 417.

District Court, E. D. Illinois.
Nov. 11, 1933.

Dobbins & Dobbins, of Champaign, Ill., for plaintiff.

Green & Palmer, of Urbana, Ill., for defendant.

LINDLEY, District Judge.

In a special count the averments of the plaintiff disclose the following facts: On the 21st day of December, A. D. 1931, plaintiff entered into an agreement with the First National Bank of Champaign, whereby, in consideration of the purchase by her from the bank of five United States treasury notes, then worth on the open market $8,500 each, at their face value of $10,000 each, the bank agreed that upon demand it would repurchase from her the notes so sold at the said principal amount, together with interest accrued

thereon. Thereafter the said bank, at her request, repurchased three of said bonds from her at the sum of $10,000 each as agreed. On the 18th day of January, A. D. 1932, the bank had ceased to do business; its assets had been taken over by the United States government; and shortly thereafter defendant was appointed receiver thereof. When said bank closed, plaintiff still owned two of said notes, then of the market value of $8,431.25 each. She tendered one of the same to officials of the bank and to one Wilson, examiner in charge thereof, and demanded the repurchase thereof as agreed. The bank and the examiner refused to purchase, and she thereupon sold the note upon the open market for its then market value of $8,431.25. After defendant's appointment as receiver, she made demand upon him for her loss, and tendered to him the remaining note for $10,000, and demanded that he repurchase the same in conformity with said agreement. This defendant refused to do, and she disposed of same upon the open market for $9,618.75. She now sues to recover as damages the money paid by her for the last two mentioned notes, less the realization therefrom at the market value at the time of sale as aforesaid, approximately $2,500. It will be observed that this is a special count in assumpsit for money had and received under the specific circumstances therein set forth.

Defendant demurs upon the ground that under the provisions of the National Banking Act it is prohibited from making agreements of repurchase such as that hereinbefore set forth, and that plaintiff, therefore, is without right of action.

■ Defendant is receiver of a national bank, and bound by the limitations upon the corporate power thereof. Such authority is derived from the act of Congress under which such banks are organized (12 USCA § 21 et seq.). They are instrumentalities of the federal government, created for a public purpose, and necessarily subject to the paramount authority of the United States. Congress is the judge of the extent of the powers which should be conferred on them, and has the sole power to regulate and control them. The interpretation of the acts defining this authority is peculiarly the province of the federal courts. Davis v. Elmira Sav. Bank, 161 U. S. 275, 16 S. Ct. 502, 40 L. Ed. 700; Easton v. Iowa, 188 U. S. 220, 23 S. Ct. 288, 47 L. Ed. 452; State v. Clement Nat. Bank, 84 Vt. 167, 78 A. 944, Ann. Cas. 1912D, 22.

■ It is not necessary to review the numerous provisions of the statute, but sufficient to advert to the seventh paragraph of section 24 of the National Banking Act as amended, February 25, 1927, U. S. Code Ann. title 12, § 24, subd. 7. That amendment, amongst other things, grants to a national bank authority to carry on all "such incidental powers as shall be necessary to carry on the business of banking." It is expressly provided "that the business of buying and selling investment securities shall hereafter be limited to buying and selling without recourse marketable obligations evidencing indebtedness," etc. Thus the statute expressly prohibits the selling of investment securities with recourse. It follows that there was no statutory power upon the part of the bank to make a sale of marketable securities such as these notes, giving to the purchaser recourse upon it. For the present we shall treat the agreement to repurchase as a contract furnishing recourse to plaintiff upon defendant and discuss later an interpretation of same in another light.

■ In such situation it is well recognized that the contract can acquire no efficacy by way of confirmation, ratification, or estoppel. As said by Chief Justice White in California National Bank v. Kennedy, 167 U. S. 362, 17 S. Ct. 831, 834, 42 L. Ed. 198:

"It would be a contradiction in terms to assert that there was a total want of power by any act to assume the liability, and yet to say that by a particular act the liability resulted. The transaction, being absolutely void, could not be confirmed or ratified. As was said by this court in Union P. R. Co. v. Chicago, R. I. & P. R. Co., 163 U. S. 564, 16 S. Ct. 1173 [41 L. Ed. 265], speaking through Mr. Chief Justice Fuller (page 581, 163 U. S., and page 1180, 16 S. Ct. [41 L. Ed. 271]):

" 'A contract made by a corporation beyond the scope of its powers, express or implied, on a proper construction of its charter, cannot be enforced, or rendered enforceable, by the application of the doctrine of estoppel.' "

Other authorities to the same effect are Thomas v. West Jersey R. Co., 101 U. S. 71, 25 L. Ed. 950; Central Transp. Co. v. Pullman's Palace-Car Co., 139 U. S. 24, 11 S. Ct. 478, 35 L. Ed. 55; Union P. R. Co. v. Chicago, R. I. & P. R. Co., 163 U. S. 564–581, 16 S. Ct. 1173, 41 L. Ed. 265; California Nat. Bank v. Kennedy, 167 U. S. 362, 17 S. Ct. 831, 42 L. Ed. 198.

■■ Plaintiff does not dispute these propositions of law, but asserts that, though a national bank is not liable for an act beyond its statutory powers upon the doctrine of estoppel or ratification, it may not receive the

money of plaintiff upon such a contract, repudiate the same, and retain the benefit.

The agreement between plaintiff and defendant was an entire contract and the inducement for the plaintiff to purchase the notes was the ultra vires promise of the bank to repurchase the same, not at the market value, but at the same sum which plaintiff paid for the same; that is, the principal amount, then in considerable excess of the market value. The consideration upon which she relied when she purchased the notes at their face value instead of their market value was the void promise of the bank to repurchase the same at the same price. Thus it follows that, if the bank is now to be free of obligation to return to her any of her money, it will be permitted to retain that which it has received from the plaintiff, surrendered by her upon the inducement of its void agreement. Such result will permit the bank to reap the benefits of an ultra vires agreement, to deny the validity of the agreement, and to refuse to surrender that which it has received upon faith thereof. This the law will not permit. It pronounces the contract invalid, proclaims that it cannot be made valid by estoppel or ratification, and forbids an action upon the same. It goes further, however, and announces that the defendant may not receive the benefit of an ultra vires contract and retain the same with immunity. It gives to the plaintiff, whose money or property has been received, the right to recover—not upon the contract, but in assumpsit, in rescission of the contract—the benefits which defendant has received from plaintiff, which in good conscience it ought not to retain. As stated by Thompson on Corporations (3d Ed.) vol. 4, § 2893: "The strict doctrine of ultra vires prevents a recovery on the contract but does not leave a party injured by the disaffirmance of the contract without remedy. The general rule where property transferred to a corporation under a contract which is ultra vires but not malum in se, is that the party receiving such property may be compelled to refund to the other contracting party the value of that which it has actually received."

The same author further states that the recovery may be had in an action for money had and received, or in a suit in equity to compel an accounting and restitution.

The Supreme Court in the case of Salt Lake City v. Hollister, 118 U. S. 256, 6 S. Ct. 1055, 1059, 30 L. Ed. 176 said: "The courts have gone a long way to enable parties who had parted with property or money on the faith of such contracts to obtain justice by recovery of the property or the money specifically, or as money had and received to plaintiff's use."

In Humboldt Min. Co. v. American Mfg. Co. (C. C. A.) 62 F. 356, 362, Judge Taft said: "In cases where property has been received or money paid to the corporation seeking to avoid the obligations of an ultra vires contract, the person delivering the property or paying the money has the remedy of recovering back that which was given to the corporation on the faith of the ultra vires contract. This, however, as has been said several times by the supreme court of the United States, is not a recovery on the contract, but is, in effect, an avoiding of the contract, and a restoration of the parties to the status quo."

Many cases illustrative of this rule are found in the decisions of the Supreme Court. One of such is Citizens' Central National Bank v. Appleton, Rec. etc., 216 U. S. 196, 30 S. Ct. 364, 366, 54 L. Ed. 443. There a national bank, which, in order to secure repayment of a loan by its debtor, requested another bank to loan the necessary money and guaranteed payment at maturity, though contracting beyond its powers, was held bound to account to the party making the loan. The court said: "Whatever may be said as to the validity of the written guaranty, now alleged to be illegal, the judgment can be supported as based wholly on the implied contract, which made it the duty of the Central National Bank, under the facts disclosed, to account to the Cooper Exchange Bank for the money obtained from the latter in execution of the agreement made by the former with the borrower."

In the case of Aldrich v. Chemical National Bank, 176 U. S. 618, 20 S. Ct. 498, 505, 44 L. Ed. 611, an officer of the national bank, without authority, borrowed money from another bank and placed the amount so borrowed to the credit of the national bank which drew out the money and used the same. When it was sought to hold the national bank liable, it defended upon the ground that the original borrowing was unauthorized and in violation of the National Banking Act. The court reviewed the authorities fully, and said that, inasmuch as the national bank "used the money so obtained in its banking business and for its own benefit, the latter bank, having enjoyed the fruits of the transaction, cannot avoid accountability to the New York bank, even if it were true, as contended, that the Fidelity Bank could not consistently with the law of its creation have itself borrowed the money. * * * If the latter bank in this

way used the money obtained from the Chemical Bank, it is under an implied obligation to pay it back or account for it to the New York bank. It cannot escape liability on the ground merely that it was not permitted by its charter to obtain money from another bank."

In Rankin, etc., v. Emigh, 218 U. S. 27, 30 S. Ct. 672, 676, 54 L. Ed. 915, the Supreme Court had before it the question of liability of a bank which had illegally and in violation of its charter power operated an insolvent creamery company. The bank received the proceeds of the sale of the milk, became insolvent, and those who delivered the milk to the creamery were allowed to participate pro rata as general creditors in a liquidation of the bank to the extent that such proceeds of sale had been appropriated by the bank. The Supreme Court of Wisconsin had so held. Emigh v. Earling, 134 Wis. 565, 115 N. W. 128, 27 L. R. A. (N. S.) 243. The Supreme Court pointed out that under the National Banking Act the bank had no power whatsoever to engage in this business, but it affirmed the Supreme Court of Wisconsin, saying: "That this ruling is here applicable is plainly manifested by the fact which we have previously pointed out, that the relief afforded by the court below simply gave to the producers so much of their property as was actually in the hands of the receiver, and awarded them a right to recover as general creditors of the bank to the extent only that their property had been received and appropriated by the bank."

In Central Transportation Co. v. Pullman's Palace-Car Co., 139 U. S. 24, 11 S. Ct. 478, 488, 35 L. Ed. 55, where many cases are discussed, the corporation had made a contract wholly beyond its statutory power. The court held that, though the corporation could not be estopped to deny the invalidity of such a contract, an action for the return of property or money surrendered in reliance upon the unauthorized contract was one to disaffirm the contract, and was properly sustainable. The court said:

"A contract ultra vires being unlawful and void, not because it is in itself immoral, but because the corporation, by the law of its creation, is incapable of making it, the courts, while refusing to maintain any action upon the unlawful contract, have always striven to do justice between the parties, so far as could be done consistently with adherence to law, by permitting property or money, parted with on the faith of the unlawful contract, to be recovered back, or compensation to be made for it.

"In such case, however, the action is not maintained upon the unlawful contract, nor according to its terms; but on an implied contract of the defendant to return, or, failing to do that, to make compensation for, property or money which it has no right to retain. To maintain such an action is not to affirm, but to disaffirm, the unlawful contract."

In Logan County Nat. Bank v. Townsend, 139 U. S. 67, 11 S. Ct. 496, 499, 35 L. Ed. 107, the bank, contrary to its charter powers, had purchased certain county bonds, and, refusing to return the bonds on demand, repudiated as illegal the agreement under which it received them. The court held that there was due plaintiff the difference between the price paid by the bank and the value of the bonds at the time the plaintiff demanded compliance with the illegal contract. The Supreme Court said: "It would seem, upon defendant's theory of its powers, to be too clear to admit of dispute that the act of congress does not give a national bank an absolute right to retain bonds coming into its possession, by purchase, under a contract which it was without authority to make. True, it is not under a duty to surrender possession until reimbursed the full amount due to it; it has the right to hold the bonds as security for the return of the consideration paid for them; but when such amount is returned, or tendered back to it, and the surrender of the bonds is demanded, its authority to retain them no longer exists. And from the time of such demand, and its refusal to return the bonds to the vendor or owner, it becomes liable for their value upon grounds apart from the contract under which it obtained them. It could not rightfully hold them under or by virtue of the contract, and at the same time refuse to comply with the terms of purchase. If the bank's want of power, under the statute, to make such a contract of purchase, may be pleaded in bar of all claims against it based upon the contract,—and we are assuming, for the purposes of this case, that it may be,—it is bound, upon demand, accompanied by a tender back of the price it paid, to surrender the bonds to its vendor. The bank, in this case, insisting that it obtained the bonds of the plaintiff in violation of the act of congress, is bound, upon being made whole, to return them to him. No exemption or immunity from this principle of right and duty is given by the national banking act."

To the same effect is American Nat. Bank v. National Wall-Paper Company, 77 F. 85 (C. C. A. 8); National Bank of Commerce in St. Louis v. Equitable Trust Co. of N. Y. (C. C. A.) 227 F. 526.

In the present case plaintiff relied upon an invalid promise of a national bank to repurchase securities which she bought, at the price she paid for the same. As she parted with her money and the bank received the same upon faith of its illegal agreement, the latter cannot retain it as against the plaintiff. It is not bound to perform its unauthorized contract, but it must account to plaintiff for the money which she paid it upon the faith of its wrongful agreement.

■ It appears, however, that, after tendering its bonds, the plaintiff disposed of the same upon the open market for a sum in excess of the market value at the time she purchased the same, and she sues to recover from the defendant merely that which will make her whole upon her original payment of money to the bank.

That this is the correct measure of damages appears from the decision of the Supreme Court in the case of Logan County Nat. Bank v. Townsend, supra. There the court said: "The amount found in plaintiff's favor was the difference between the price paid by the bank and the value of the bonds at the time the plaintiff demanded compliance upon its part with the alleged contract. The result is, substantially, the same as if the plaintiff had tendered back the amount received from the bank and demanded a return of the bonds or their value; in which case it would have been liable for the value of the bonds, at least, at the time of the demand. * * * Our conclusion upon the whole case, so far as the questions arising in it may be reviewed by this court, is that, if the bank had no authority to purchase the bonds in question, it is yet not exempt, by reason of anything in the national banking act, from liability to the plaintiff for the difference between the price it paid for them and their value at the time it refused, upon plaintiff's demand, to comply with the contract made by it for their purchase, and held on to the bonds."

So here plaintiff has a good cause of action for such part of the original consideration delivered to the bank upon her faith in its illegal agreement as will now make her whole.

■ Plaintiff insists that the contract in question was one of conditional sale and not one within the statute forbidding sales with recourse on the seller. A similar contract was so interpreted by the Supreme Court of Illinois in Wolf v. National Bank of Ill., 178 Ill. 93, 52 N. E. 896, 898. There the court said: "Under the contracts, the amount to be paid by the bank to the plaintiff in case he desired to return the bonds was the face value and interest on the amount which the plaintiff had paid, and interest from the time of payment. The obvious intention of the parties was to make a conditional sale, and the condition upon which the purchase was made was that the bank should take the bonds back at the same price if within a specified time the plaintiff desired to return them. In other words, the bonds were turned over by the bank to the plaintiff at a certain stipulated price, with the distinct agreement that the plaintiff had the right, during the month of January, 1897, to elect whether he would keep them or return them to the bank, and, in case he concluded to return the bonds, he was entitled to receive his money back, with interest. The transaction was one both reasonable and proper, and one not within or prohibited by the statute."

Later cases in Illinois follow this interpretation of such contracts. See Stewart v. Dodson, 282 Ill. 195, 118 N. E. 405, 1 A. L. R. 1544; Ubben v. Binnian, 182 Ill. 508, 55 N. E. 552. The law of contracts generally recognizes the validity of such conditional contracts of sale sometimes described as "sale or return" agreements. See Sturm v. Boker, 150 U. S. 312, 14 S. Ct. 99, 37 L. Ed. 1093; 1 Meacham on Sales, §§ 675–685; 55 Corpus Juris, 585. The Circuit Court of Appeals for the Seventh Circuit announced the soundness of such contracts in the case of Ophir Cons. Mines Co. v. Brynteson, 143 F. 829, 833. There a corporation had sold stock with an agreement to repurchase it and refund the money therefor with interest within a certain time if the purchaser so desired. The court said:

"It was of the well-recognized class, known as a contract of 'sale or return,' as defined in Sturm v. Boker, 150 U. S. 312, 328, 14 S. Ct. 99, 104, 37 L. Ed. 1093, where the title passes for the time being, but subject to the option of the purchaser to rescind and return the property within the time stipulated. With the exercise of the option the contract of sale terminates and the right and title of the corporation is restored to its original status. No sale has been accomplished, and no purchase or repurchase arises upon the part of the corporation through this re-

turn of its unsold stock. As held in the recent Minnesota case of Vent v. Duluth Coffee & Spice Co. [64 Minn. 307], 67 N. W. 70, such transaction is not ultra vires, within the rule applicable to purchase of stock. In the case of Tolman v. New Mexico, etc., Mica Co., 4 Dak. 4, 22 N. W. 505, cited contra, the contract under consideration appears to have been one of actual repurchase of stock by the corporation, and the ruling is deemed inapplicable to the present controversy.

"The contention that the contract was fraudulent as to other stockholders and creditors requires no discussion, under the foregoing view that no sale of stock was effected, so that the agreement to repay the investment for purchase money, if the stock was not purchased, called for no diversion of corporate funds—plainly distinguishable from the cases cited of release of subscribing stockholders."

The recent case of Awotin v. Atlas Exchange National Bank, 265 Ill. App. 238, is directly in point. There a national bank, owning certain real estate bonds, sold them to the plaintiff at their face value, agreeing contemporaneously that it would, if plaintiff desired, repurchase the same upon maturity at face value and accrued interest. The court held that the transaction amounted to a conditional sale which was valid as such, and that subdivision 7 of section 24 the National Bank Act as amended hereinbefore quoted had no application thereto. It should be observed, moreover, that the court further held that, if the agreement were to be treated as ultra vires under said subdivision 7, still the bank would not be allowed to repudiate the agreement and retain the benefits therefrom, but would be liable to plaintiff in assumpsit for money had and received.

It may be proper to treat the present contract as one of "sale and return" within the meaning of those words as defined in the authorities aforesaid and not one creating recourse against the bank. It seems entirely logical to say, that none of the bank's funds is involved, for the reason that, under the contract as made, the bank could not lose. In other words, plaintiff gave the bank $50,000. She received the notes. Her contract merely allowed her to take back her own money and return the notes as in the case last above cited. Such is not, properly speaking, a diversion of the bank's funds. If this analysis of the contract is a correct one, there is a clear liability upon the part of the defendant on this theory.

However, if such reasoning be erroneous, and if the contract in question was invalid

under the terms of the Banking Act as amended, because, in effect, it created recourse against the bank, then, even though no action can be maintained upon the contract or for breach of it, defendant will not be allowed to repudiate the agreement and retain its benefits.

The demurrer is overruled.